NOT DESIGNATED FOR PUBLICATION

No. 124,280

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interests of L.B. and O.B.,
Minor Children.

MEMORANDUM OPINION

Appeal from Sedgwick District Court; MICHAEL J. HOELSCHER, judge. Opinion filed April 8, 2022. Affirmed.

*Grant A. Brazill*, of Morris, Laing, Evans, Brock & Kennedy, Chartered, of Wichita, for appellant natural father.

*Kristi D. Allen*, assistant district attorney, and *Marc Bennett*, district attorney, for appellee.

Before ATCHESON, P.J., WARNER and HURST, JJ.

PER CURIAM: The appellant—the natural father of L.B. and O.B.—challenges the district court's decision to terminate his parental rights. The court found that the appellant, whom we refer to as Father, was unfit based on several statutory factors, stemming in part from Father's disappearance, arrest, jail time, and potential criminal culpability while this case was pending. The court also found that Father's unfitness was unlikely to change in the foreseeable future and that terminating his rights was in the children's best interests. Father asserts on appeal that the evidence did not support the court's findings that he was an unfit parent. After carefully reviewing the record before us and the parties' arguments, we affirm the court's decision.

1

FACTUAL AND PROCEDURAL BACKGROUND

In June 2019, Wichita police conducted a welfare check after receiving a report that two young children were chasing a dog around a trailer park unsupervised. The children—L.B., born in 2013, and his younger sister O.B., born in 2015—were dirty but otherwise appeared healthy.

L.B. and O.B. informed the police that they did not know where their mother was. Mother eventually arrived and spoke to the police and to the caseworkers from the Kansas Department for Children and Families (DCF). She explained that the children lived with her and that their 15-year-old cousin was supposed to be watching them. DCF then learned that Mother's water and electricity were recently shut off. Mother agreed to take a drug test and tested positive for multiple illegal drugs.

A few days later, DCF contacted Father, who was no longer in a relationship with Mother and did not speak to her often. Father had gotten out of jail a month earlier and had just started a new job. He told the caseworker that he was splitting his time between living with a friend and living with his sister when he had L.B. and O.B. Father also agreed to submit drug tests; his original urinalysis was negative, but his first hair test was positive for methamphetamine.

About a week after the initial report, the district court entered an ex parte order to place the children in DCF custody. The State then petitioned the district court to adjudicate L.B. and O.B. as children in need of care. The petition alleged, with regard to Father, that he could not care for the children because he had no stable housing, tested positive for methamphetamine, was on probation, and had pending criminal charges. The State was also concerned about Father's extensive criminal history and a history of domestic violence with Mother, which L.B. had described to caseworkers. Mother had obtained a protection from abuse order against Father in 2017 for an argument that the

children witnessed. And DCF had received five reports about the family in the past six months, including allegations of domestic violence in front of the children and physical abuse of L.B., who at that time was five years old.

Father and Mother each submitted no-contest statements in response to the petition. In October 2019, the district court adjudicated L.B. and O.B. to be children in need of care. The court then set a permanency hearing for two months later, with a stated goal of reintegration.

At the December 2019 permanency hearing, the court found that Father was making progress toward reintegration. Father had been employed by a general contractor for several months. He had completed a substance-abuse evaluation, had started therapy and drug treatment, and had attended budgeting and nutrition classes. Father also owned a four-bedroom trailer that he was presently renting to others for income; he was prepared to move into the home with L.B. and O.B. if he obtained custody. And other than the hair follicle test in August 2019 that was positive for methamphetamine, none of Father's other random tests reflected drug use.

That said, though Father had made significant strides toward reintegration, not all the evidence was positive. In particular, the State had lingering concerns that Father did not have a driver's license and had pending criminal charges for auto theft, obstruction, and fleeing or eluding; if Father were convicted, these offenses could carry lengthy prison sentences. And the history of Father's violence and abuse remained a significant concern.

Over the next several months after the permanency hearing, Father continued to make progress and complete reintegration tasks:

- He pleaded guilty to the pending criminal charges and was placed on 12 months' probation (with an underlying 48-month prison sentence).

- He completed a substance-abuse assessment and continued attending the required classes. He was employed, albeit on a cash-payment basis, and when he was laid off in early 2020, he was able to find work shortly thereafter.

- He was in a serious relationship with his soon-to-be fiancé, who also submitted to background checks and random drug testing—all of which were negative.

Father and his girlfriend also consistently attended weekly visits with L.B. and O.B. in person or virtually, as the pandemic required, and Father regularly communicated with his case manager. These visits went well, and the supervisor never observed any issues in Father's interactions with the children.

In early summer 2020—one year into the case—the case manager was prepared to reintegrate L.B. and O.B. with Father after his continued progress over the past year. Father sold his trailer and was preparing to move into a four-bedroom house with his fiancé and her three children. And Father and his fiancé had begun family therapy with L.B. and O.B., one of the final steps before the children would be ready to reintegrate with their parents.

But in July 2020, this progress ground to a halt. After Father allegedly participated in an armed home invasion, he was charged with aggravated burglary, aggravated kidnapping, two counts of kidnapping, and aggravated robbery. With a criminal history score of A, Father would face up to 825 months in prison if he were convicted of these charges. The State also sought to revoke Father's recently granted probation and impose his underlying 48-month prison sentence.

When these new charges were filed, Father disappeared and was missing for over a month. Neither the children's case team nor his family knew his whereabouts during this period. He also suffered a gunshot wound at some point while on the run. Father was eventually apprehended and arrested in late August 2020; he spent the next three months in jail and was released on bond in November 2020.

Not surprisingly, Father ceased making progress with his children when he disappeared or was in jail. During that time,

- Father missed several significant incidents involving his children. O.B. was hospitalized for medical issues, and L.B. was hospitalized twice for mental health episodes; L.B.'s mental health led the case team to separate him from O.B. and place him in a new foster home.

- Father's visits were stalled, along with the family therapy he and his fiancé had recently started with the children.

- In light of Father's new charges, the case manager asked that he complete a batterers-intervention-program assessment or attend anger-management classes (though Father was never ordered by a court to complete these tasks).

And shortly after Father's arrest, the State changed its approach to the case and moved to terminate his parental rights.

Nevertheless, after he was released from jail in November 2020, Father attempted to resume regular visits with the children. At the outset, these visits seemed to go well, but as time went on, caseworkers had significant concerns that the children feared Father and continued to suffer consequences from his past behavior.

5

From November 2020 to April 2021, Father continued visits with L.B. without issue. But the same was not true for O.B., who was diagnosed with posttraumatic stress disorder from trauma she experienced living with Father, Mother, and L.B. O.B.'s therapist reported that even though O.B. seemed fine during visits, she experienced persistent outbursts and nightmares, and she urinated on herself before and after visits. According to the therapist, there were no issues during O.B.'s visits with Father because O.B. felt pressure to please Father. Her therapist also reported that O.B.'s mental health markedly improved when she was not having visits with Father. Based on this information, the case team suspended Father's visits with O.B. entirely in January 2021 due to concerns about her mental health when around Father and her brother.

The district court conducted an evidentiary hearing on the State's termination request (which involved both Mother and Father) over four days in April and May 2021. At the time of the hearing, the pending charges against Father had not been resolved, nor had his probation been revoked. Father had lived in the four-bedroom home with his fiancé and her children for several months. After a span of unemployment—including his recent disappearance and incarceration—Father was working full-time. And he had completed nearly all his court-ordered reintegration tasks.

At the hearing, Father presented evidence of his progress in his reintegration case plan. But he also acknowledged his four-plus month disappearance and incarceration in the middle of the case. He acknowledged potential looming incarceration from his July 2020 charges, pending probation revocation, or both. Father and his fiancé agreed that she could, and would, care for the children—including coparenting with Mother if necessary—should he be ordered to serve prison time.

The hearing also included testimony regarding Father's actions when he lived with the children and Mother—long before the July 2020 incident. Father missed both L.B.'s and O.B.'s births because he was incarcerated, and he had been incarcerated on and off

for much of their lives. By Father's own admission, he had an extensive criminal history and had been convicted of "everything." And although he felt he had a good relationship with L.B. and O.B., he knew that they feared him and he admitted to disciplining them with a "whoopin'" and making them "hold the wall up"—that is, stand against a wall with their nose touching it and their hands above their head.

Father also acknowledged that he had physically abused Mother and that L.B. had witnessed his actions. The evidence showed that after L.B. exhibited violence in foster care—leading to his separation from O.B. and a new foster placement—L.B. stated that he could use violence in that situation because his dad did; he told his therapist that his dad hits women.

Finally, the court heard testimony regarding the children's behavioral and mental health needs and Father's apparent failure to prioritize those needs. The evidence showed that Father opposed giving L.B. his recommended medication, and Father missed meeting with L.B.'s provider about that medication when he disappeared. And at the termination hearing, Father could not remember that in one of his last visits with O.B., L.B. had threatened to kill her.

After considering the evidence, the district court terminated both parents' parental rights in June 2021—two years after the case began. As to Father, the court found that he was unfit to parent L.B. and O.B. based on several statutory factors. The court also determined that Father's unfitness was unlikely to change in the foreseeable future and that termination was in L.B.'s and O.B.'s best interests. Father now appeals, claiming the evidence did not support the district court's findings relating to his unfitness.

DISCUSSION

A parent has a constitutionally protected liberty interest in the relationship with his or her children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697-98, 187 P.3d 594 (2008). Thus, before terminating parental rights, Kansas law requires a district court to find the State has proved that the parent is unfit, that the conduct or condition that renders the parent unfit is unlikely to change in the foreseeable future, and that termination of parental rights is in the children's best interests. K.S.A. 2020 Supp. 38-2269(a), (g)(1). Because of the fundamental nature of this right, any findings relating to a parent's unfitness must be proved by clear and convincing evidence. K.S.A. 2020 Supp. 38-2269(a); *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 1, 336 P.3d 903 (2014).

When reviewing a finding of parental unfitness, this court must determine, after considering all the evidence in a light favoring the State, whether the evidence is sufficient to support the court's decision—that is, whether a rational fact-finder could have found it highly probable that the parent was unfit. *In re B.D.-Y.*, 286 Kan. 686, Syl. ¶ 4. We do not reweigh conflicting evidence, pass on the credibility of witnesses, or otherwise independently decide disputed questions of fact. 286 Kan. at 705.

After finding a parent unfit—both at the time of the termination hearing and for the foreseeable future—the district court must determine if termination of parental rights is "in the best interests of the child." K.S.A. 2020 Supp. 38-2269(g)(1). This assessment gives "primary consideration to the physical, mental and emotional health of the child." K.S.A. 2020 Supp. 38-2269(g)(1). Because determining what is in a child's best interests is inherently a judgment call, we will only overturn a district court's best-interests determination when it constitutes an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, Syl. ¶ 2. A district court exceeds the broad latitude it is afforded if it rules in a way no reasonable person would have under the circumstances, ignores controlling facts or

relies on unproven factual representations, or acts outside the appropriate legal framework. *State ex rel. Secretary of DCF v. Smith*, 306 Kan. 40, 60, 392 P.3d 68 (2017).

Father argues that the record is insufficient to support the district court's findings by clear and convincing evidence that he was unfit to parent L.B. and O.B. He asserts that—aside from the months when he was missing or in jail in 2020—he followed orders, completed tasks, and made significant progress. Father points out that he had not been convicted of any new crimes or had his probation revoked at the time of the termination hearing. And he asserts that, in the event he must go to prison, he has a plan for his fiancé to care for the children. Father also argues some of the court's unfitness findings were out of his control, such as pandemic-related delays and O.B.'s suspended visits.

As we discuss below, the fundamental flaw in Father's arguments is that they ask this court to reweigh the evidence presented to the district court. In other words, Father asks that we find the evidence relating to compliance with the case plan and other actions to be more compelling than the district court did. And he asks that we place less emphasis on the factors the court found particularly persuasive—Father's history of violence, his disappearance and arrest during the case, and the possibility that he might be incarcerated for a significant period of time while L.B. and O.B. are growing up.

But it is not the role of an appellate court to reweigh the evidence presented at trial. Instead, we must determine whether there is evidence in the record to support the district court's findings. If that evidence exists, and if the district court's legal conclusion flowing from those findings is sound, we must affirm the court's judgment. We do so here.

*Unfitness*

Before terminating parental rights, a district court must determine whether a parent is unfit—that is, whether the parent engages in conduct or has a condition that renders him or her "unable to care properly for a child"—and whether that unfitness is "unlikely to change in the foreseeable future." K.S.A. 2020 Supp. 38-2269(a). To assess a person's fitness or unfitness as a parent, the district court considers, among other things, the several factors listed in K.S.A. 2020 Supp. 38-2269(b) and (c). Depending on the facts and circumstances of each individual case, evidence showing any one of these factors can be enough to support a finding of parental unfitness. K.S.A. 2020 Supp. 38-2269(f).

Here, the district court found that several factors listed in K.S.A. 2020 Supp. 38-2269 were present and relevant in this case:

- The court found Father had used intoxicating liquors or narcotics or dangerous drugs of such duration or nature as to render him unable to care for the children's needs. See K.S.A. 2020 Supp. 38-2269(b)(3).

- The court found that the caseworkers had engaged in reasonable efforts to rehabilitate the family, but those efforts had failed as a result of Father's actions or inactions—notably, Father's disappearance, arrest, and jail time following the events in July 2020. See K.S.A. 2020 Supp. 38-2269(b)(7).

- The court found that Father had not adjusted his circumstances, conduct, or conditions to meet the children's needs. See K.S.A. 2020 Supp. 38-2269(b)(8).

- The court found that the children have been in State custody for a lengthy time—at least 15 of the most recent 22 months—because of Father's actions or inactions. See K.S.A. 2020 Supp. 38-2269(b)(9). The court also found considerations in

10

K.S.A. 2020 Supp. 38-2269(c)(1), (c)(2), and (c)(3), which may arise when the children are placed outside the family home, to be present here.

The district court concluded, in light of these findings and the evidence presented, that the State had proved Father was unfit to parent L.B. and O.B.

In his appeal, Father challenges evidence underlying each of the district court's findings relating to the statutory factors. We acknowledge that the evidence supporting some of these findings is limited. For example, Father argues the evidence did not show that he used drugs in such a way that would render him unable to care for L.B. and O.B. within the meaning of K.S.A. 2020 Supp. 38-2269(b)(3) because he only tested positive for methamphetamine at the beginning of the case. And Father asserts the evidence showed he completed the court-approved reintegration plan, consistent with K.S.A. 2020 Supp. 38-2269(c)(3), and the requests that remained outstanding were merely requested by caseworkers (and not ordered by the court). Accord *In re J.W.*, No. 112,668, 2015 WL 8590309, at *11 (Kan. App. 2015) (unpublished opinion) (agency's action adding requirements outside the court-approved reintegration plan was not a reasonable effort to rehabilitate the family under K.S.A. 2014 Supp. 38-2269[b][7]). But even if we were to agree with Father that the record does not support some of the district court's findings, we nevertheless find there was sufficient evidence to support the court's ultimate conclusion that Father was unfit.

In particular, Father's appeal seeks to downplay or minimize the role of his actions in the summer and fall of 2020—when he allegedly engaged in violent criminal behavior, went missing and ceased all contact with his children and the caseworkers, and eventually was arrested and held in jail. Most of Father's arguments contain a caveat that asks this court to observe Father's conduct *other than what occurred* in that period. In doing so, Father notes that, at the time of the termination hearing, he had not been convicted of any of the criminal charges stemming from that period, nor had his probation been revoked.

11

In essence, Father claims that in the absence of a conviction, the district court should have viewed that period as a blip of questionable behavior in an otherwise promising progression toward reintegration.

Father analogizes his case to *In re T.H.*, 60 Kan. App. 2d 536, 494 P.3d 851, *rev. denied* 314 Kan. 855 (2021), where this court recently reversed a decision terminating an incarcerated father's parental rights when he otherwise had supported his child and provided for their housing and care while he was in prison. The father in *In re T.H.* would be incarcerated for at least five years based on conduct that was unrelated to and occurred months before the child-in-need-of-care case. Father argues that under our decision in *In re T.H.*, the district court here should not have considered the possibility that he could face significant prison time arising out of the July 2020 events or his probation violation. We do not read *In re T.H.* so broadly, however. And as we explained there, the appropriateness of a district court's termination decision turns on the "facts of each case." 60 Kan. App. 2d 536, Syl.

*In re T.H.* analyzed a district court's finding of parental unfitness under K.S.A. 2020 Supp. 38-2269(b)(5)—the parent's "conviction of a felony and imprisonment." The child in that case had lived with his father for most of his life and by all accounts was "thriving" in the father's care. 60 Kan. App. 2d at 536. The father's incarceration following his conviction was "the *only* reason for termination." 60 Kan. App. 2d at 550.

The facts of this case are different from *In re T.H.* in many ways. Here, L.B. and O.B. had not lived with Father for much of their lives and had been living exclusively with Mother, while Father was previously incarcerated. Both L.B. and O.B. are afraid of Father. O.B. has expressed fear that Father would kidnap and kill her, and her fear of Father—combined with physical and psychological manifestations of that fear—led to caseworkers suspending visits in January 2021. Unlike the father in *In re T.H.*, Father has a history of violence against Mother; the children witnessed this abuse, and L.B. has used

12

Father's past conduct to justify his own violent outbursts. And despite regular visits for much of this case, Father went missing, returned with a gunshot wound, and was in jail for three months in the middle of the State's reintegration efforts.

The district court was required to consider all the evidence presented to determine whether the State had proved Father's unfitness. It thus heard evidence concerning Father's actions before the case was filed and Father's conduct throughout the proceedings (including Father's disappearance in July 2020, subsequent arrest, and jail time). And this evidence was sufficient to support the district court's findings under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), and (b)(9).

*K.S.A. 2020 Supp. 38-2269(b)(7)* allows a district court to consider whether—and why—reintegration failed, despite reasonable efforts by the caseworkers. Here, the State presented evidence, through the caseworkers' testimony, regarding their efforts to rehabilitate and reintegrate the family. In the first year of this case, the case manager communicated and met with Father regularly—checking on his progress with completing tasks, discussing concerns about the children, and working to involve his fiancé in reintegration. The caseworkers facilitated regular meetings with Father and regular visits with L.B. and O.B., even when virtual meetings and visits were necessary because of the pandemic. There can be no doubt that these efforts were reasonable. In fact, in the summer of 2020, the case manager—on the brink of transferring custody of the children to Father—asked him to begin family therapy, the final step before reintegration.

For whatever reason, however, Father's conduct changed substantially in July 2020. He was charged with multiple violent crimes and disappeared, violating both the court-ordered case plan and his probation. Yet the State's efforts to rehabilitate the family did not stop. While Father was missing, the case manager made regular attempts to locate him and kept in contact with his family and probation officer. When he was apprehended,

13

arrested, and jailed, the case manager sent him monthly letters with self-addressed prepaid return envelopes so Father could communicate about the case while incarcerated.

When Father was released from jail in November 2020, the children were in markedly different states than they had been the previous summer. L.B. had engaged in violent conduct and had threatened his sister, causing them to be separated; L.B. attempted to justify his conduct by pointing to Father's violent past. O.B. was fearful of both L.B. and Father, and this fear manifested itself both physically and psychologically around Father's visits, causing those visits to stop altogether. In other words, there is evidence in the record to support the district court's finding that Father's own choices derailed the caseworkers' reasonable efforts toward reintegration.

On appeal, Father focuses primarily on the additional tasks the case manager asked him to complete—the anger management classes and the batterers-intervention-program assessment—that were not part of the original court-ordered reintegration plan. We note that these requests were made as a result of the events of July 2020 and their aftermath; in light of those events, the case manager's requests were not unreasonable. But even if those requests had not been made, the record supports the district court's findings under K.S.A. 2020 Supp. 38-2269(b)(7).

*K.S.A. 2020 Supp. 38-2269(b)(8)* allows a district court to consider a parent's efforts to adjust his or her circumstances, conduct, or conditions to the children's needs. Father argues that the evidence here did not support an unfitness finding under this factor because—even if he were eventually incarcerated, either as a result of new convictions for the July 2020 charges or the revocation of his probation—he made plans for his fiancé to care for the children.

But as we have discussed, Father's potential incarceration was not the only evidence showing his lack of adjustment. Instead, the evidence showed that even though

initially Father made strides in the case plan, things turned sour in the summer of 2020. Father disappeared for over a month and lost contact not only with the case manager and his probation officer, but with his family. He reappeared with a gunshot wound and missed several months of visits with L.B. and O.B. while he remained in jail. Even assuming Father committed no new crimes and faced no potential incarceration at the time of the termination hearing, disappearing for over a month—especially when the case was at the point of reintegration—shows a lack of effort to change his conduct and circumstances.

Though Father appears to have had a backup plan if he went to prison—having his fiancé care for L.B. and O.B.—that proposal does not render the district court's finding under K.S.A. 2020 Supp. 38-2269(b)(8) erroneous. Father is correct that having a care plan in the event of incarceration is one consideration the court can take into account. See *In re T.H.*, 60 Kan. App. 2d at 552. But once again, Father overlooks that fact that K.S.A. 2020 Supp. 38-2269(b)(8) is not just about incarceration; it is about a failure to change his circumstances and conduct. The evidence in the record is sufficient to support the district court's finding under K.S.A. 2020 Supp. 38-2269(b)(8).

*K.S.A. 2020 Supp. 38-2269(b)(9)* allows a district court to consider, when at least one of the factors listed in K.S.A. 2020 Supp. 38-2269(c) apply, whether, as a result of a parent's actions or inactions, children have had been in the State's custody "for 15 of the most recent 22 months." Father acknowledges that L.B. and O.B. have been in State custody for over 15 of the most recent 22 months, but he asserts that part of this time is attributable to the COVID-19 pandemic. He also challenges the district court's findings relating to the predicate considerations in K.S.A. 2020 Supp. 38-2269(c).

Turning to Father's first argument, the record does not support his assertion that the pandemic caused L.B. and O.B. to be in State custody for more than 15 of the last 22 months. While it is true that both Kansas and Sedgwick County implemented stay-at-

home orders in the spring of 2020, Father does not explain how these orders impacted this case. Instead, the record shows that despite the pandemic, Father made significant strides that spring—while the stay-at-home orders were in effect. As we have indicated, these strides were interrupted not by the pandemic, but by Father's own actions.

The record also supports the district court's finding that at least one of the circumstances in K.S.A. 2020 38-2269(c) were applicable. The district court relied on K.S.A. 2020 Supp. 38-2269(c)(1) ("[f]ailure to assure care of the child in the parental home when able to do so"); K.S.A. 2020 Supp. 38-2269(c)(2) ("failure to maintain regular visitation, contact or communication with the child or with the custodian of the child"); and K.S.A. 2020 Supp. 38-2269(c)(3) ("failure to carry out a reasonable plan approved by the court directed toward the integration of the child into a parental home"). But only one of these considerations needed to be present to support the court's finding under K.S.A. 2020 Supp. 38-2269(b)(9).

Independent of the district court's analysis of Father's housing plans or visitation efforts, the record supports the court's finding that K.S.A. 2020 Supp. 38-2269(c)(3) applied. In his challenge, Father reiterates his previous argument relating to the caseworkers' efforts after his arrest and jail time in the fall of 2020. But just as this argument was not persuasive under K.S.A. 2020 Supp. 38-2269(b)(7), it is similarly unconvincing here.

For these reasons, we conclude that the district court's findings under K.S.A. 2020 Supp. 38-2269(b)(7), (b)(8), and (b)(9) are supported by sufficient evidence in the record. In light of these findings and the evidence presented, the district court did not err when it found Father was unfit within the meaning of K.S.A. 2020 Supp. 38-2269.

*Unfitness to Continue for the Foreseeable Future*

After making an unfitness finding, a district court must determine whether a person's unfitness as a parent is likely to change in the foreseeable future. K.S.A. 2020 Supp. 38-2269(a). A court evaluates "foreseeable future" from a child's perspective because children have a different perception of time. *In re R.S.*, 50 Kan. App. 2d at 1117. For a child, "a month or a year seem[s] considerably longer than it would for an adult." *In re M.S.*, 56 Kan. App. 2d 1247, 1263, 447 P.3d 994 (2019); see K.S.A. 2020 Supp. 38-2201(b)(4). A court can look to a parent's past conduct as a predictor of the foreseeable future. 56 Kan. App. 2d at 1264; *In re Price*, 7 Kan. App. 2d 477, 483, 644 P.2d 467 (1982).

Father does not challenge the district court's finding that his unfitness will continue for the foreseeable future. For the sake of completeness, however, we note that there is evidence in the record to support the district court's finding. At the termination hearing, when the case had been pending almost two years, L.B. was seven and O.B. was six years old. They had been in foster care since June 2019—a significant portion of both their lives. When Father was missing for a month and went to jail for three months, that period would have seemed far longer for L.B. and O.B. than it would for an adult. Indeed, the evidence presented regarding the children's actions during that period and their conversations with their therapists showed that Father's actions during those few months had a profound impact on them. The children's therapists testified at the termination hearing that, given these setbacks, it would be at least another nine months before reintegration could be considered. Putting this into perspective for O.B., such a delay would mean that almost half her life would have been spent in State custody and foster care—still without any guarantee of permanency.

Father's actions during that period also suggested that he has not learned to change his behavior, even when he knew that his parental rights depended on it. Father made

17

some laudable efforts during the pendency of this case—refraining from drug use and going through drug treatment, providing a home for the family, visiting the children, and generally complying with the court-ordered case plan. But intertwined with his progress was a troubling pattern of recurring violent lapses. Father had abused Mother in front of L.B. when he was young, and this conduct affected both children directly or indirectly. Father had been entangled with the criminal justice system throughout the children's lives. He was incarcerated when both were born and continued to have legal trouble as they got older. When this case began in June 2019, Father was recently released from three months of incarceration. He was on probation during this case and admitted to absconding—a probation violation that could result in the imposition of his underlying prison sentence. And Father was charged with serious felonies right before he went missing, more than a year into the State's reintegration efforts.

In short, there was sufficient evidence presented at the termination hearing to support the district court's conclusion that the circumstances that led to Father's unfitness were unlikely to change for the foreseeable future.

*Best Interests of the Children*

Father also does not challenge the district court's determination that termination of his parental rights was in the children's best interests, and the district court did not abuse its discretion when it reached that conclusion. During the termination hearing, the State presented evidence that both L.B. and O.B. suffer significant mental health challenges stemming from their time with Father and Mother. In foster care, L.B. had to be separated from O.B. because of violent behavior that he claimed to have learned from Father. And O.B. is so fearful of Father that caseworkers had to suspend visits with Father to preserve her mental health.

18

The evidence also showed that L.B. and O.B. both need consistency, which Father had not provided. Just when he appeared to be making significant strides, Father disappeared, was arrested on serious felony charges, and went to jail. When he was gone, he missed hospitalizations, family therapy, and visits. Father has also shown a reluctance to acknowledge the severity of the children's issues and the effect of his behavior on their well-being. The district court did not abuse its discretion when it determined that terminating Father's parental rights is in the children's best interests.

Before concluding our discussion, we pause to address Father's consternation regarding the drastic change in the State's position between May 2020, when the case appeared to be progressing toward reintegration, and August 2020, when the State moved to terminate his parental rights. It is true, as Father indicates, that the evidence at the termination hearing showed that the State was on the verge of reintegration before Father's actions and disappearance in July 2020. Father's conduct during that period, and the potential consequences that may be associated with those actions, are troubling. And several other troubling conditions relating to the children came to light—or significantly worsened—during that same period.

We need not speculate as to whether the district court would have terminated Father's parental rights if an evidentiary hearing had been held in this case in June 2020 rather than April and May 2021. Instead, we must determine whether the evidence presented at the hearing was sufficient to support the district court's finding that the State proved Father's unfitness by clear and convincing evidence. We conclude the State made this showing. Even excluding the possibility of Father's convictions following the July 2020 events and his potential incarceration, when we review the evidence in the light most favorable to the State, as our standard of review requires, the record is sufficient to support the district court's unfitness finding. We therefore affirm the district court's decision.

19

Affirmed.